UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:
CASEY MARIE ANTHONY,

         Debtor.
_____/

ROY KRONK,

         Appellant,
                              Case No.    8:19-cv-674-T-33
v.                            Bankr. No.  8:13-bk-922-RCT

CASEY MARIE ANTHONY,

         Appellee.
_____/

**<u>ORDER</u>**

In the context of an adversary proceeding commenced in a Chapter 7 bankruptcy case, Appellant Roy Kronk appeals the Bankruptcy Court's determination that Kronk's defamation claim against the Debtor, Casey Anthony, was dischargeable in Anthony's underlying bankruptcy proceedings, and its resulting final judgment in favor of Anthony. Kronk, represented by counsel, filed a brief in support of his appeal on June 17, 2019. (Doc. # 14). Anthony, proceeding pro se after her attorneys withdrew from representation, did not file a brief. (Doc. ## 16, 18, 23). As discussed below, the Court affirms the decision of the Bankruptcy Court.

I.   **Background**

   A.   **Anthony's Criminal Trial and the Underlying Defamation Action**

   The following facts are taken from the Bankruptcy Court's "Undisputed Facts" section in the order on appeal. Kronk does not dispute the veracity of these facts.

   Caylee Marie was reported missing in July 2008. Her mother, Casey Anthony, was arrested shortly thereafter and charged with, among others, child neglect and obstruction. Casey Anthony was released from police custody for a brief period after her initial arrest, but then was formally indicted for her daughter's murder and incarcerated again on October 14, 2008. She remained in custody until a jury acquitted her of the capital murder charges in July 2011.

   While out of jail in the late summer and early fall of 2008, Casey Anthony met and interacted with an unpaid private investigator named Dominic Casey. The circumstances and events surrounding Mr. Casey's involvement in the criminal case are ambiguous and confusing to say the least. But it is clear that he had no contact with Casey Anthony after October 14, 2008.

   During the criminal proceedings, Casey Anthony was represented by many attorneys including, but not limited to, Jose Baez, Andrea Lyons, and Linda Kenney-Baden (collectively, the "Attorneys"). Ms. Anthony signed a retainer agreement with Jose Baez on July 17, 2008, and a second retainer agreement with Mr. Baez on September 3, 2008. Ms. Kenny-Baden and Ms. Lyons joined the defense team at Mr. Baez's invitation sometime after October 14, 2008.

   In December 2008, Roy Kronk, a meter reader for Orange County, led investigators to Caylee Marie's body in a wooded area not far from Ms. Anthony's home.

As the criminal proceedings progressed, the case drew national attention. The media attention was unrelenting and, fair to say, was not favorable to Casey Anthony.

In November 2009, Mr. Baez and Ms. Lyons filed a motion *in limine* in the criminal proceedings that implicated Mr. Kronk in the crime. The motion *in limine* states that the evidence to be presented at trial of bad acts by Mr. Kronk related to statements from his son, his ex-wives, and the daughter of his ex-girlfriend.

After filing the motion *in limine*, the Attorneys began a media blitz of their own to discuss the allegations in the motion *in limine* and to try to counter the bad publicity that Casey Anthony was receiving in the press. They appeared on television and made comments picked up by the print media that raised suspicions about Mr. Kronk's discovery of Caylee Marie's remains. The media blitz also gave voice to the statements referenced in the motion *in limine* made by Mr. Kronk's ex-wives and others, who did not have good things to say about Mr. Kronk. According to the National Enquirer, Jill Kerley, one of Mr. Kronk's ex-wives, was "the most vicious in her accusations against her husband."

Casey Anthony was acquitted of the capital murder charges on July 5, 2011. However, she was convicted of giving false information to the police about the circumstances of Caylee Marie's disappearance.

A few months after the trial concluded, Mr. Kronk filed a defamation action against Casey Anthony in the Ninth Judicial Circuit Court for Orange County. But the lawsuit was not served on Ms. Anthony until January 2013. Ms. Anthony responded by filing the underlying chapter 7 bankruptcy petition within days of being served with the state court complaint. She received her bankruptcy discharge on December 17, 2013.

(Doc. # 5-51 at 3-5).

**B.  Adversary Proceeding before the Bankruptcy Court**

Prior to Anthony receiving her discharge, Kronk instituted an adversary proceeding in the Bankruptcy Court. See (Doc. # 5-4). In that proceeding, he sought an order that his defamation claim be excluded from Anthony's bankruptcy discharge because the claim resulted from willful and malicious injury within the meaning of 11 U.S.C. § 523(a)(6). (Doc. # 5-6 at ¶¶ 23-34).

According to Kronk's amended complaint in the adversary proceeding, Anthony, through her attorneys "who acted as her agents," published false and defamatory statements about him during the investigation into Caylee's disappearance and Anthony's subsequent criminal trial. (Id. at ¶ 12). These statements were made "out of court" on television shows, national publications, and other media formats, and were widely published. (Id.). To support his amended complaint, Kronk pointed to the following specific statements:

- November 18, 2009: Attorney Baez made a statement in an out-of-court interview that, "[W]e are not playing around and we are going to get to the bottom of things. . . . [I]t is very odd [about Kronk finding the skull]."

- November 20, 2009: Attorneys Baez and Lyon appeared on NBC's *Today Show* and gave certain statements meant to implicate Kronk in the murder, including that "the state and the police should have investigated [Kronk] as a suspect; there were so many red flags, it was a sea of red";

- November 20, 2009: Attorney Kenney-Baden appeared on *The Early Show*, stating that there was just as much evidence against Kronk as against Anthony and that "it is easy to snatch a kid away";

- November 20, 2009: Attorney Kenney-Baden appeared on *TruTV*, making comments about "suspicious circumstances" in "a grand coincidence of [Kronk] finding the body";

- December 7, 2009: Attorneys Baez, Lyon, and Kenney-Baden made statements reported in "national publications" implicating Kronk in the murder and abusing his character, including statements that Kronk had a prior criminal history, had a history of abusing women, and had been involved with holding women against their will;

- December 23 or 24, 2009: Attorney Baez told WKMG Channel 6 news that "the defense team is not backing off . . . from their position that Kronk was the killer" or from any statements made in the motion *in limine*;

- June 11, 2011: Attorney Lyon appeared on the television program *20/20* calling Kronk's behavior "very suspicious" and calling Kronk "a morally bankrupt individual."

(Id. at ¶ 12(a)-(g)).

Anthony answered the amended complaint, denying the material allegations and raising numerous affirmative defenses. (Doc. # 5-7). Anthony also moved for judgment on the pleadings on the grounds that she did not make the statements in question. (Doc. # 5-8). Kronk responded in opposition, attaching discovery responses from Anthony and the affidavit of Dominic Casey in support. (Doc. ## 5-9 through 5-12).

The Casey Affidavit is key to this case, and provides in relevant part:

> In August[] 2008, I was a detective hired to work with the Defense team for the murder trial wherein Casey Anthony was accused of killing her daughter, Caylee Marie Anthony.

During the publicity involved in the missing child case, Casey Anthony became aware of the telephone calls made to police by Roy Kronk in August of 2008 indicating he may have located the remains of Caylee Anthony. She (Casey Anthony) told me at that time, "Caylee is not coming home, they need to get used to that."

She (Casey Anthony) asked me in September 2008 if, "the guy found anything?"

In October 2008, just prior to the remains being found, Casey Anthony told me that when Caylee came up missing, the back gate was left ajar. Since Roy Kronk was a meter reader for the house, maybe "we could say Roy Kronk kidnapped Caylee."

I told her then I would not do that because we both know he had nothing to do with Caylee's disappearance, but she was insistent that he (Roy Kronk) be implicated or blamed in some way.

On December 11, 2008, it was confirmed that Roy Kronk had discovered Caylee's remains.

During a meeting at the hotel that evening, Jose Baez came to meet with George and Cindy Anthony. She asked him what was found. Attorney Baez said, "let's go to the room to talk, Roy Kronk is very, very suspicious."

I have never met with, spoken with, corresponded with or in any manner communicated with Roy Kronk at any time up to and including the date of signing this Affidavit.

Based on my personal knowledge of the events and statements I personally heard from Casey Anthony[,] she authorized and permitted her attorneys including, Jose Baez, to make false statements about Roy Kronk to portray him as a murderer and or kidnapper of Caylee Anthony.

(Doc. # 5-10). The Casey Affidavit is dated December 28, 2015. (Id. at 3).

Because Kronk had introduced evidence beyond the pleadings, the Bankruptcy Court instructed the parties to frame the issues on motions for summary judgment. (Doc. # 5-14).

### C.  **Anthony's Summary Judgment Motion and Evidence**

In December 2017, Anthony moved for summary judgment. (Doc. # 5-46). In support of her motion, Anthony submitted an affidavit and her own deposition, along with the exhibits thereto. (Doc. ## 5-19 through 5-32; Doc. ## 5-41 through 5-43).

In her affidavit, Anthony averred that:

I never authorized or directed my defense attorney, Jose Baez, Esq., or other members on the defense team representing me in the murder charges, including Linda Kenney Baden, Esq. and Andrea Lyon, Esq. to say anything about the Plaintiff, Roy Kronk.

Prior to making this affidavit, I did not know and had never communicated with the Plaintiff, Roy Kronk.

I was incarcerated for the murder charge from October 14, 2008 to July 5, 2011 when I was found not guilty of the murder of my daughter Caylee Marie Anthony.

What Jose Baez, Esq., Linda Kenney Baden, Esq. and/or Andrea Lyon, Esq. said to the public and the

media while I was incarcerated was unknown to me
until I was served with this lawsuit in 2013.

While incarcerated, I never asked my defense
attorneys including Jose Baez, Esq., Linda Kenney
Baden, Esq. and Andrea Lyon, Esq., or anyone else,
to say or publish anything about the Plaintiff, Roy
Kronk.

(Doc. # 5-41).

In her deposition, Anthony stated that, while she was
incarcerated and awaiting trial, she did not have access to
a computer, newspapers, or other periodicals. (Doc. # 5-19 at
5-6). Anthony admitted that, while she was incarcerated, she
was aware that she was getting an abundance of bad press and
was also aware that her lawyers were speaking to the press.
(Id. at 20-21). She knew that her attorneys were "sometimes"
speaking to the press, but most of the time she found out
about these statements after the fact. (Id. at 23). She
testified, however, that she "never knew the content of what
was said. All I knew is that they may or may not have talked
to this show or to this paper." (Id. at 24).

Anthony testified that she never knew, at any time, that
her lawyers were accusing Kronk of the murder. (Id.). She
claims that the first time she was made aware of this was
when Kronk filed the defamation suit. (Id. at 24-25). As for
the motion *in limine* filed by her attorneys that implicated

Kronk, Anthony testified that this strategy was never discussed with her, she did not read the motion beforehand, and could not even recall if she attended the hearing on that motion. (Id. at 25; Doc. # 5-20 at 26-27). Anthony further testified that she had no idea that her attorneys went on a "media blitz" following the filing of that motion *in limine*. (Doc. # 5-20 at 29-30). Anthony denied thinking, at any time, that Kronk killed her daughter, and admitted that accusing someone of killing a child could hurt that person's reputation. (Id. at 30).

As part of her deposition, counsel showed Anthony various media reports involving her attorneys' statements allegedly implicating Kronk in Caylee's murder. (Id. at 34, 39, 41, 48). Anthony stated that she had no knowledge of any of these reports and did not authorize any of the statements. (Id. at 35, 36, 40, 41-42, 48).

Anthony also filed the deposition of Dominic Casey, and the exhibits thereto, in support of her summary judgment motion. (Doc. ## 5-35 through 5-40). During his deposition, Anthony's attorney pressed Casey on the statement from his affidavit that:

> Based on my personal knowledge of the events and statements I personally heard from Casey Anthony[,] she authorized and permitted her attorneys

including, Jose Baez, to make false statements
about Roy Kronk to portray him as a murderer and or
kidnapper of Caylee Anthony.

(Doc. # 5-39 at 67).

In his deposition testimony, Casey stood by the statements in his December 2015 affidavit, (Id.; Doc. # 5-36 at 120-21), but Casey was also clear on two points. First, he never saw or heard Anthony explicitly give directions or authorization to her attorneys to make statements about Kronk or implicate Kronk in Caylee's murder. For example, when asked whether he remembered Anthony "ever saying or writing . . . please give false statements to . . . implicate Mr. Kronk," Casey responded that, "She did not say those words." (Doc. # 5-39 at 72). When asked whether he ever saw Anthony put in writing an authorization for her attorneys to make remarks about Kronk on her behalf, Casey answered, "There is no such documents." (Doc. # 5-36 at 125). Casey also denied ever hearing Anthony tell Baez that he was "authorized to blame Mr. Kronk for any incident here[.]" (Id.). Casey even re-affirmed these answers later in the deposition:

> Q:  Ms. Fryer asked you whether you heard Ms.
> Anthony say to you that she authorized Jose
> Baez to create a false story about Roy Kronk,
> and you said you never heard those words,
> correct?  Is that correct?

A:    That  would  be  correct.  That  is  absolutely
          true.

(Id. at 150-51).

    Second,  Casey  testified  that  by  "authorizing"  her
attorneys to make false statements, he meant that Anthony was
"agreeing  with  what  the  conversations  [were]"  and  "felt  as
though  she  had  to  go  along  with  whatever  Jose  [Baez]  said."
(Doc. # 5-39 at 70).

    Counsel  asked  Casey,  "Do  you  remember  specifically  what
Ms.  Anthony  said  about  Mr.  Kronk,  what  permission  she  gave
Jose  Baez  about  —  regarding  Mr.  Kronk?"  (Doc.  #  5-36  at  45).
Casey  responded,  "Permission  is  by  not  saying  something  to
say  we're  not  going  to  blame  him,  right?  She  is  going  along
with  what  Baez  is  saying."  (Id.).  Similarly,  later  in  the
deposition,  the  following  exchange  occurred:

    Q: Did  you,  personally,  hear  from  Casey  Anthony
    that  she  permitted  her  attorneys,  including  Jose
    Baez,  to  portray  people,  including  Roy  Kronk,  make
    false  statements  about  them  as  being  responsible
    for  the  murder  of  Caylee  Anthony?

    . . .

    A:    She  was  complicit  in  what  was  going  on.  This
    is what [Baez is] feeding her and she's going along
    with it. Right?

    Q:    Okay.

A:   So, I mean, she's like listening to somebody that she thinks is providing good advice, but he's not.

Q:   And she allowed him to say that stuff, right?

A:   She's going along with the crap. You saw the trial, didn't you? When I saw the trial — I did not see the trial until after the trial; and when I saw that trial after then, I'm like what the bloody hell's going on here.

.  .  .

Q: But you witnessed her going along with it, right?

A: Of course she went along with it.

Q: Okay.

A: She was going along with whatever Jose Baez said.

Q: Okay.

A: That was the bottom line, and I would not. But she didn't know any better. That's why I was saying she was bloody naive.

(Id. at 123-24).

Counsel at one point clarified further:

Q:   Okay. If I understand correctly, the problem — would it be fair to say the problem was [Anthony] didn't fire [Baez], that she didn't direct her own case, that she allowed Jose [Baez] to direct the case? Is that correct?

A:   She had nothing to do with her own case. That was the thing.

Q:   That was the problem?

A:   She didn't do nothing or saying it. Right, nothing. And I'm like, hold on a minute. And

13

whatever he's — he's suggesting or whatever was — it didn't accommodate the case or her. It accommodated his personal enrichment.

(Id. at 126).

Counsel pressed Casey on the subject of Anthony's involvement in her own defense:

> Q:   I'd like to go back to my previous question, though. You testified earlier that Ms. Anthony didn't have anything to do with her own case.
>
> A:   She had nothing to do with nothing.
>
> Q:   Well, let me ask you this.
>
> A:   As far as the case goes, that is.
>
> Q:   Well, what do you mean by that?
>
> A:   He got bloody –
>
> Q:   Was she making decisions, I mean, for her own case?
>
> A:   No, no.
>
> Q:   Was she authorizing Jose Baez to say things?
>
> A:   Nothing. This was the bloody thing. It was nothing. I said, look, you need to get a grip of yourself, this is your case, forget what that idiot's telling you because it's all wrong. Right? All he's interested in is making money and you are going to — you're not going to be feeling very good about it. . . . I saw the bloody thing going on. She was doing — because he said it, she believed it.
>
> Q: And she let him say that, right? And she didn't stop him from saying that?
>
> . . .

A: She had no idea what the bloody hell was going on. She's too naive. She was then.

Q:  Okay. And then what about later?

. . .

A: Up until — up until October the 14th . . . 2008 — up until then, what I knew about Casey Anthony was she was naive as a bloody fool and whatever that — whatever that scoundrel would tell her is what she would do. True, false — true or false, it didn't matter. If he said — whatever he said that was outrageous, she would go along with it.

Q: Including making up a story about Roy Kronk, correct?

. . .

A: She would go along with any bloody thing he said. That's the way it was.

(<u>Id.</u> at 157-59).

According to Casey, he did not see or talk to Casey after October 14, 2008, when she was incarcerated on the charges. (<u>Id.</u> at 161).

### D.   **The Bankruptcy Court's Order Granting Summary Judgment to Anthony**

According to the Bankruptcy Court, the fundamental issue presented in this case was "whether Casey Anthony willfully and maliciously injured Mr. Kronk, within the meaning of [Section] 523(a)(6) of the Bankruptcy Code, through the acts of her attorneys." (Doc. # 5-51 at 2).

The Bankruptcy Court first addressed whether vicarious liability could support a non-dischargeable debt under Section 523(a)(6) as a matter of law. (Id. at 12). The Bankruptcy Court concluded that "courts uniformly do not recognize vicarious liability to satisfy the 'willful' requirement for a [Section] 523(a)(6) claim," and found Kronk's cited authority to the contrary inapposite. (Id. at 12-15).

Second, the Bankruptcy Court considered whether a criminal defendant may ever be vicariously liable for potentially defamatory statements made to the media by her defense counsel. (Id. at 16). According to the Bankruptcy Court, Kronk "largely assumes that an attorney-client relationship operates the same as an employer-employee relationship. But that assumption must be tested by the complications of an attorney-client relationship." (Id.). The Bankruptcy Court cited the privileges inherent in an attorney-client relationship, the attorney's role as an officer of the court, and the typical balance of power between an attorney and his client as factors that must be considered in assessing vicarious liability based on an agency theory arising from an attorney-client relationship. (Id. at 16-18).

Next, the Bankruptcy Court refused to strike the Casey Affidavit as a "sham" affidavit because it determined that Casey's deposition testimony "can be reasonably construed as an explanation and clarification of what he meant in his earlier affidavit." (Id. at 18).

The Bankruptcy Court also rejected Kronk's argument that Anthony's assertion of her Fifth Amendment privilege in connection with the murder case required the Court to draw an adverse inference that precluded summary judgment. (Id. at 19). As the Bankruptcy Court described, Kronk's obstacle was not the Fifth Amendment, but attorney-client privilege between Anthony and her attorneys – "[Kronk's] case for vicarious liability necessarily invades confidential communications between Ms. Anthony and her attorneys." (Id. at 20).

The Bankruptcy Court thus turned to the "sole issue" before it – "whether there is a triable issue of fact that Ms. Anthony willfully and maliciously injured Mr. Kronk as those terms are used in [Section] 523(a)(6) of the Bankruptcy Code." (Id. at 21). For purposes of summary judgment, the Bankruptcy Court assumed that the statements made by Anthony's attorneys were defamatory and that Kronk had been injured by those statements. (Id.). On the issue of

willfulness, the Bankruptcy Court concluded that the record evidence established that Anthony did nothing "willful" to injure Kronk because, at most, Anthony had a general knowledge that her attorneys were speaking to the press and she had no knowledge of the contents of those statements. (Id. at 21-22). As the Bankruptcy Court noted, the "best evidence" that Kronk has is the Casey Affidavit, and the statements in that affidavit were clarified by Casey's deposition testimony, namely, that Anthony had nothing to do with her own case and preparation for trial. (Id. at 22). The Bankruptcy Court concluded that "mere acquiescence and deference to attorneys by a young, unsophisticated person facing capital murder charges, or her failing to fire those lawyers under circumstances where she had little reason to suspect the attorneys were doing anything untoward, does not satisfy the 'willful' injury prong of [Section] 523(a)(6)." (Id.).

As for the malicious injury prong, the Bankruptcy Court noted that it was undisputed that part of the criminal defense team's strategy was to counter the onslaught of negative media attention their client was facing. (Id. at 23). And, given the totality of the circumstances, the Bankruptcy Court found this purpose was not wrongful or without cause. (Id.). Accordingly, the Bankruptcy Court found that such conduct

does not satisfy the "malicious" requirement of Section 523(a)(6), even if such conduct could be imputed to Anthony. (Id.).

In conclusion, the Bankruptcy Court wrote that:

> Construing all inferences in favor of Mr. Kronk, all that this record can prove is that Ms. Anthony acquiesced, perhaps blindly, to the defense crafted by her attorneys and to the extent she even knew what was going on, she did not fire them. There is no evidence of an intent to cause Mr. Kronk injury necessary to render the alleged debt nondischargeable, and that assumes liability might be imputed to her in the event the statements by her attorney were proven to be defamatory. For these reasons, the court will grant [Anthony's] motion for summary judgment.

(Id. at 24).

The Bankruptcy Court then entered a final judgment in favor of Anthony in the adversary proceeding. (Doc. # 5-52). Kronk timely appealed the Bankruptcy Court's final judgment and its order on summary judgment to this Court. (Doc. #5-53). The only briefing before the Court is Kronk's initial brief, as Anthony's attorneys withdrew from representation and Anthony did not file a pro se brief within the time allotted to do so. (Doc. ## 16, 18, 23). The appeal is now ripe for review.

## II.  Legal Authority

### A.    Standard of Review

Upon entry of a final order by the Bankruptcy Court, a party may appeal to the United States District Court pursuant to 28 U.S.C. § 158(a). The District Court functions as an appellate court in reviewing decisions of the Bankruptcy Court. In re Colortex Indus., Inc., 19 F.3d 1371, 1374 (11th Cir. 1994).

Under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings in bankruptcy cases by Bankruptcy Rule 7056, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation and quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for

trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

"Like a district court, a bankruptcy court may only grant summary judgment where there is no genuine issue of material fact." <u>In re Optical Techs., Inc.</u>, 246 F.3d 1332, 1334 (11th Cir. 2001). Thus, this Court reviews all aspects of a bankruptcy court's grant of summary judgment de novo. <u>Id.</u> at 1335 (explaining that because a summary judgment decision by definition involves no findings of fact, "our law is, and has been, that a summary judgment ruling is reviewed de novo").

### B.  <u>11 U.S.C. § 523(a)(6)</u>

"A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition." <u>In re Kane</u>, 755 F.3d 1285, 1292 (11th Cir. 2014) (citation omitted). There are, however, several exceptions to the general rule of discharge. <u>Id.</u> One of those exceptions is contained in Section 523(a)(6), which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The creditor has the burden of proving an exception to discharge by a preponderance of the evidence. <u>Kane</u>, 755 F.3d at 1293. The intentional tort of defamation may constitute a "willful and malicious injury" so long as

the debtor knew the published statements were false. <u>In re</u> <u>Durrance</u>, 84 B.R. 238, 239 (Bankr. M.D. Fla. 1988).

A debtor commits a "willful" injury when "he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." <u>Kane</u>, 755 F.3d at 1293 (quoting <u>In re Jennings</u>, 670 F.3d 1329, 1334 (11th Cir. 2012)). Debts arising from recklessly or negligently inflicted injuries do not fall within the statute's parameters. <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61, 64 (1998) ("The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury.").

The statute also requires a showing of "malicious" injury, which means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." <u>Jennings</u>, 670 F.3d at 1334 (quotation marks and citation omitted). For the purposes of Section 523(a)(6), malice can be implied. <u>Kane</u>, 755 F.3d at 1294. "Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice." <u>In re Ikner</u>, 883 F.2d 986, 991 (11th Cir. 1989).

Exceptions to the general rule of discharge should be strictly construed against an objecting creditor and liberally in favor of the debtor. In re Fretz, 244 F.3d 1323, 1327 (11th Cir. 2001). Therefore, bankruptcy courts narrowly construe Section 523's exceptions to discharge. In re Miller, 39 F.3d 301, 304 (11th Cir. 1994); see also In re Northup, No. 00-01066 CAB, 2001 WL 34747362, at *3 (Bankr. D. Vt. Apr. 3, 2001) ("It is well recognized . . . that exceptions to discharge pursuant to 11 U.S.C. § 523 must be strictly construed against an objecting creditor and liberally in favor of the debtor in order to be consistent with the liberal spirit that has always pervaded the entire bankruptcy system to allow a debtor a fresh start.").

## III. **Analysis**

On appeal, Kronk raises multiple alleged errors on the part of the Bankruptcy Court that, he claims, merit reversal. First, he argues that Anthony failed to meet her initial burden on summary judgment because there is record evidence of a willful and malicious injury. (Doc. # 14 at 6-9). Second, Kronk claims that Anthony's attorneys' statements were not privileged and that Casey's affidavit should not be stricken. (Id. at 9-12). Third, he argues that the Bankruptcy Court erred in applying the legal standard to the facts. (Id. at

12-14). Fourth, the Bankruptcy Court allegedly erred in finding no evidence of maliciousness. (Id. at 14-16). Fifth, Kronk avers that the Bankruptcy Court erred by not drawing inferences in the light most favorable to Kronk as the non-movant. (Id. at 16-24). Finally, Kronk argues that the Bankruptcy Court erred in applying the "advice of counsel" defense and refusing to allow further discovery. (Id. at 24-27).

### A. Whether the Bankruptcy Court properly granted summary judgment to Anthony

Kronk's primary argument on appeal is that the Bankruptcy Court erroneously entered summary judgment in Anthony's favor in the adversary proceeding. To this end, Kronk argues that Anthony failed to meet her initial burden on summary judgment because there is record evidence of a willful and malicious injury. (Doc. # 14 at 6-9). Relatedly, Kronk claims that, while the Bankruptcy Court enunciated the correct "willful and malicious" legal standard, it erred in applying that standard to the facts here, erred in finding no evidence of maliciousness, and failed to properly draw inferences in Kronk's favor. (Id. at 12-24).

"[A] party seeking summary judgment always bears the initial responsibility of informing the [court] of the basis

for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. Where the party opposing summary judgment is the party who bears the burden of proof, as here, a moving party can meet its burden by showing that there is an absence of evidence to support the non-movant's case. Id. at 325.

To begin, the Court agrees with the Bankruptcy Court's formulation of the issue on appeal: whether Anthony willfully and maliciously injured Kronk, within the meaning of Section 523(a)(6) of the Bankruptcy Code, through the acts of her attorneys. See (Doc. # 5-51 at 2). The Court will also assume, for purposes of this appeal, that the statements made by Anthony's attorneys were defamatory and injured Kronk. See Durrance, 84 B.R. at 239 (explaining that a defamation claim can constitute a willful and malicious injury for purposes of Section 523(a)(6)). The larger question is whether Anthony inflicted that injury **willfully and maliciously.**

It is undisputed that Anthony herself never made any statements to the media about Kronk. All of the allegedly defamatory statements cited by Kronk in his amended complaint

were made, instead, by Anthony's criminal defense attorneys. (Doc. # 5-6 at ¶ 12). The threshold issue, then, is whether an agency relationship or vicarious liability can support the non-dischargeability of a debt under Section 523(a)(6).

## 1.   **Vicarious Liability**

The Court starts, as always, with the language of the statute. Under Section 523(a)(6) of the Bankruptcy Code, debts incurred "for willful and malicious injury **by the debtor** to another entity or to the property of another entity" will not be included in the discharge from bankruptcy. 11 U.S.C. § 523(a)(6) (emphasis added). Courts have relied on this language to find that vicarious liability does not satisfy the "willful" requirement of Section 523(a)(6):

> There is nothing in the language or legislative history of [Section] 523(a)(6) to suggest that common law notions of vicarious or imputed liability are appended to the statutory exceptions to a discharge in bankruptcy. Quite the contrary, application of vicarious liability would effectively vitiate the [Section] 523(a)(6) requirement that only debts resulting from **willful** acts committed **by the debtor** be nondischargeable.

In re Austin, 36 B.R. 306, 311-12 (Bankr. M.D. Tenn. 1984) (emphases in original); see also In re Eggers, 51 B.R. 452, 453 (Bankr. E.D. Tenn. 1985) ("The legislative history accompanying [Section] 523(a)(6) indicates that a debt is nondischargeable only where injury has resulted from some

26

deliberate or intentional act **of the debtor**[.]" (emphasis in original)).

Thus, courts in the Eleventh Circuit have upheld the application of Section 523(a)(6) when the debtor herself committed some type of intentional tort or wrongful act against the claimant or his property. See, e.g., In re Gray, 322 B.R. 682, 695-96 (Bankr. N.D. Ala. 2005) (holding that debtor's sexual abuse of creditor qualified for willful and malicious exception to discharge); In re Rowland, 316 B.R. 759, 763-64 (Bankr. S.D. Ga. 2004) (debtor's conversion of claimant's property held to be willful and malicious injury); In re Houston, 305 B.R. 111, 116 (Bankr. M.D. Fla. 2003) (willful and malicious injury established where debtor filed a false insurance claim); In re Berghmann, 235 B.R. 683, 692 (Bankr. M.D. Fla. 2000) (holding that debtor's theft of payments meant for creditor constitutes a willful and malicious injury).

In contrast, a bankruptcy court in this district has concluded that a debtor's mere participation in a conspiracy to commit a tort or other wrongful act was not the sort of intentional conduct by the debtor required to trigger Section 523(a)(6)'s exception from discharge. In re Nofziger, 361 B.R. 236, 243 (Bankr. M.D. Fla. 2006). The Nofziger court

acknowledged the "basic principle" that "in order to find a debt nondischargeable under [Section] 523(a)(6), the debtor directly must commit some type of malicious, intentional tort which the debtor knew would cause harm to the creditor. A conspiracy, i.e., an agreement, to commit a tort or other wrong does not qualify." Id.

Thus, to the extent that Kronk hangs his claim on a theory of vicarious liability or agency, such an attempt is unavailing under the plain terms of the statute. The authority cited by Kronk in support of such an argument is inapposite. For example, in In re Sullivan, a debtor's conduct of allowing or failing to prevent his agents and employees from trespassing on the creditors' land and cutting down trees was found to be willful and malicious injury within the meaning of Section 523(a)(6). 198 B.R. 417, 423-24 (Bankr. D. Mass. 1996). In Sullivan, it was proven at trial that the agents and employees who directly committed the wrongful acts were under the debtor's "direction and control," and the debtor "knew his workcrew was on land which was not his and that he had no authority for the crew's removal of the trees." Id. at 423, 424. The Sullivan court acknowledged the general rule that "[d]ebts based on vicarious liability are not excepted from discharge because they are not based on deliberate or

intentional conduct by the liable party." <u>Id.</u> at 424. By contrast, in that case, "the Debtor knew this continuing trespass was being committed but did nothing about it. That is deliberate and intentional conduct within the scope of [S]ection 523(a)(6)." <u>Id.</u>

Thus, <u>Sullivan</u> does not stand for the notion that vicarious liability is a viable theory under Section 523(a)(6) but, rather, that a debtor's intentional direction to agents or employees to commit wrongful acts or the debtor's knowledge of such wrongful acts and subsequent inaction may constitute the sort of deliberate and intentional conduct necessary to meet the "willfulness" prong of Section 523(a)(6). <u>Id.</u>

The Court notes that <u>Sullivan</u> is not binding on this Court, nor is the Court confident that such a broad formulation of Section 523(a)(6) ought to be adopted. The Court need not reach that issue today, however, because even under the broad standard enunciated in <u>Sullivan</u>, Kronk has not met his burden.

## 2. <u>Willfulness</u>

Recall that a debtor commits a "willful" injury when "he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause

injury." <u>Kane</u>, 755 F.3d at 1293. Thus, to have his defamation claim excepted from discharge under Section 523(a)(6), Kronk must show by a preponderance of the evidence that Anthony committed an intentional act for the purpose of causing him injury or, under <u>Sullivan</u>, directed others to commit such acts or knew of the acts and their wrongfulness but did nothing to stop those other individuals from committing such acts.

In the absence of any statements made by Anthony herself, Kronk must therefore show that she affirmatively directed her counsel to make the allegedly defamatory statements for the purpose of injuring Kronk or that she knew her attorneys were making these statements, knew them to be wrongful or substantially certain to injure Kronk, and did nothing to stop them.

In her affidavit and in her deposition, Anthony flatly denies that she ever directed her attorneys to make statements implicating Kronk in Caylee's murder, she averred that she rarely knew when her attorneys were speaking to the media or had any advance notice of what they were going to say. She claimed to have no knowledge of their statements about Kronk until Kronk filed the adversary proceeding.

In his brief on appeal, Kronk points to the following pieces of evidence to demonstrate that there was record evidence of a willful and malicious injury: (1) Anthony's discovery response admitting that she "accused others of kidnapping" Caylee; (2) Anthony's deposition testimony that she knew her attorneys were speaking to the media; (3) her statement that defamatory and untrue statements made to the media could hurt a person's reputation; (4) Anthony's interrogatory response that her attorneys' statements to the media were made in order to obtain the public's help and offset other negative remarks; and (5) Anthony's admission during her deposition that she never, at any point, thought Kronk killed Caylee. (Doc. # 14 at 8-9). None of this evidence, considered alone or cumulatively, is sufficient to create a genuine issue of material fact as to whether Anthony committed the deliberate and intentional act of either explicitly authorizing her attorneys to make statements implicating Kronk in the murder or even that she knew of what they were doing and failed to stop them.

That leaves Kronk's key piece of evidence – Casey's statement in his affidavit that Anthony "authorized and permitted her attorneys including, Jose Baez, to make false

statements about Roy Kronk to portray him as a murderer and or kidnapper of Caylee Anthony." (Doc. # 5-10).

Kronk claims that this statement created a disputed issue of fact that precluded summary judgment and that, to the extent the Bankruptcy Court construed or interpreted this statement with reference to Casey's deposition testimony, such construction both failed to make inferences in his favor and runs afoul of summary judgment principles. (Doc. # 14 at 9, 16-22).

But a factual dispute must still be genuine for Kronk to survive summary judgment. "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247–48. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

What's more, on summary judgment, courts must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record." Garczynksi v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009). It is true that "if the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment is proper. Matsushita Elec. Indus., 475 U.S. at 587.

Thus, in considering motions for summary judgment, the record evidence must be considered as a whole, and inferences must be drawn to the extent supportable by the record. That is precisely what the Bankruptcy Court did here. It did not consider the Casey Affidavit in a vacuum but, rather, in conjunction with Casey's deposition testimony, Anthony's affidavit and deposition testimony, and the other pertinent record evidence.

Taking all of the evidence together, it is apparent that this paragraph from Casey's Affidavit is not as convincing as Kronk would have the Court believe. First, the

Affidavit only covers the period of time between August 2008, when Casey was allegedly hired by the defense team, and October 14, 2008, when Anthony was incarcerated pending trial. (Doc. # 5-10). It is undisputed that, by October 14, 2008, Anthony and Casey had no further communications. (Doc. # 5-36 at 161). Further, this brief period of interaction occurred more than one year before Anthony's attorneys began making allegedly defamatory statements to the media, as alleged in Kronk's amended complaint. See (Doc. # 5-6 at ¶ 12) (alleging actionable statements made between November 2009 and June 2011).

Second, it is clear from a close reading of Casey's deposition testimony that while Casey stood by the statement in his affidavit that Anthony "authorized and permitted" her attorneys to make certain statements about Kronk to the media, Casey meant that, in his estimation, Anthony was "bloody naïve," had no agency or voice in her own criminal defense, and that she simply went along with whatever Jose Baez suggested or did. See, e.g., (Doc. # 5-36 at 123-26, 157-59).

This does not conflict with Anthony's testimony that she knew very little about what her attorneys were saying to the press and did not even know of the substance of the motion *in limine* that her attorneys filed that led to this litigation.

(Doc. # 5-19 at 23-25; Doc. # 5-20 at 26-30). And Casey's deposition testimony entirely fails to rebut Anthony's testimony that she never explicitly directed or authorized her attorneys to make defamatory statements about Kronk and that she had no knowledge of the specific statements identified by Kronk in his amended complaint.

In sum, there is no evidence in the record of Anthony affirmatively directing her attorneys to make statements to the media implicating Kronk in the crime, nor is there even any evidence that Anthony knew her attorneys were doing so, thought it was wrongful, but contemporaneously failed to act. While it could perhaps be inferred that Anthony had knowledge of the statements due to the saturated nature of the media coverage, Anthony stated in her deposition that she did not have access to the Internet or news periodicals while in prison. (Doc. # 5-19 at 6). Kronk also urges this Court to infer from Anthony's statement to Casey in October 2008 that "maybe we could say Roy Kronk kidnapped Caylee" that Anthony somehow directed her attorneys to accuse Kronk. (Doc. # 14 at 24). But such an inference is not reasonable in light of the year-long gap between those incidents and the evidence that Anthony had nothing to do with her attorneys' strategy to deflect blame onto Kronk. See Chapman, 229 F.3d at 1023

(explaining courts must draw reasonable inferences in favor
of non-movants).

Further, to the extent Kronk advocates for a different
view of the evidence vis-à-vis Section 523(a)(6)'s "willful"
standard, the Court is guided by the rule that exceptions to
the general rule of discharge should be strictly construed
against an objecting creditor and liberally in favor of the
debtor. Fretz, 244 F.3d at 1327. The Court firmly believes
that construing the evidence in the way Kronk advances would
run counter to this purpose.

On this record, the Bankruptcy Court could not ignore
the other record evidence in order to give the Casey Affidavit
undue weight. Non-moving parties are due inferences in their
favor "to the extent supported by the record." Garczynksi,
573 F.3d at 1165. The extent of the inference Kronk seeks
here is unsupported by the record. Under these circumstances,
Kronk has not met his burden of showing that Anthony
"willfully" injured him within the meaning of Section
523(a)(6).

### 3. <u>Maliciousness</u>

To except a debt from discharge, in addition to being
willful, an injury must also be "malicious." See 11 U.S.C. §
523(a)(6) (excepting from discharge any debt "for willful **and**

36

malicious injury by the debtor") (emphasis added). This means that the injury was "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." Jennings, 670 F.3d at 1334 (quotation marks and citation omitted). In addition, "implied malice can be found if the nature of the act itself implies a sufficient degree of malice." Ikner, 883 F.2d at 991.

Having determined that the Bankruptcy Court did not err in determining that Kronk failed to meet the "willful" prong of Section 523(a)(6), the Court need not grapple with whether any injury was inflicted with malice, either direct or implied. While Kronk argues that the Bankruptcy Court erred in finding no evidence of maliciousness under these circumstances (Doc. # 14 at 14-15), any such error would be harmless because both prongs of Section 523(a)(6), willfulness and maliciousness, must be shown by a preponderance of the evidence before a debt will be excepted form discharge under the statute. Kane, 755 F.3d at 1293.

For these reasons, the Bankruptcy Court properly granted summary judgment in Anthony's favor.

The Court has now addressed all of Kronk's meritorious arguments on appeal. However, for the sake of clarity, the

Court will also briefly address certain ancillary arguments that Kronk has raised.

### B.   Anthony's arguments before the Bankruptcy Court

In his brief on appeal, Kronk takes issue with what he calls Anthony's "two primary arguments" before the Bankruptcy Court: (1) that her attorneys' statements were privileged, and (2) that Dominic Casey's affidavit should be stricken. (Doc. # 14 at 9-12). The second argument is easily dismissed because the Bankruptcy Court explicitly did not strike Casey's affidavit in its Order and considered Casey's affidavit testimony. (Doc. # 5-51 at 18-19).

As to Anthony's attorneys' statements being privileged, the Bankruptcy Court and Kronk are in agreement that the motion *in limine* filed in state court is absolutely privileged. (Doc. # 14 at 10; Doc. # 5-51 at 17). The dispute arises over whether her attorneys' statements to the media were covered by a qualified privilege. The Bankruptcy Court wrote that "if the out of court statements by the Attorneys related to the criminal proceedings in general or more specifically to the motion *in limine*, then the Attorneys' comments are protected by a qualified privilege absent proof of express malice." (Doc. # 5-51 at 17).

While Kronk goes to pains to distinguish the state-law case cited by the Bankruptcy Court to support this assertion, this Court notes that the Bankruptcy Court's musings on the existence of a qualified privilege were done in the context of the Bankruptcy Court delineating the differences between the attorney-client relationship and a typical employer-employee relationship. (Id. at 16-18). In "applying the law to the facts," however, the Bankruptcy Court did not have need to take up the qualified-privilege issue. (Id. at 20-21). Instead, the Bankruptcy Court assumed for the purposes of summary judgment that Kronk had suffered an injury within the meaning of Section 523(a)(6) but stated in dicta that "[w]ere it to reach the issue [of whether the statements were defamatory], the court would entertain significant doubts in light of the factors discussed above, particularly the qualified privilege likely accorded to the Attorneys' statements." (Id. at 21). Thus, the Bankruptcy Court's statements on qualified privilege had no bearing on its ultimate determination on the Section 523(a)(6) issue.

## C.    The "advice of counsel" defense

Kronk argues that the Bankruptcy Court implied in its order that it considered Anthony to have raised an "advice of counsel" defense and erred both by applying this defense and

by refusing to allow further discovery on this newly raised defense. (Doc. # 14 at 24-26). Kronk mischaracterizes the Bankruptcy Court's conclusions. In writing that Anthony "acquiesced in her defense to the extent that she did not fire the Attorneys" and was "young and naïve when these events unfolded," the Bankruptcy Court was merely pointing out that the Casey Affidavit was not "all that inconsistent" with Anthony's testimony. (Doc. # 5-51 at 22). The Bankruptcy Court was not inventing a defense for Anthony. This is not a proper ground to reverse the Bankruptcy Court's decision.

### D.   Withdrawing the reference

Finally, Kronk argues that this Court should have withdrawn the reference and decided Anthony's motion for summary judgment itself. (Doc. # 14 at 4, 27).

The question of the dischargeability of a debt under Section 523(a)(6) of the Bankruptcy Code is distinct from the merits of any underlying defamation claim. In re Anthony, 538 B.R. 145, 151 n.33 (Bankr. M.D. Fla. 2015). The dischargeability issue that the Bankruptcy Court addressed was well within its jurisdiction to consider. Id. at 151-52; see also In re Yanks, 95 B.R. 234, 235 (Bankr. S.D. Fla. 1989) (stating that a Section 523(a)(6) proceeding is a "core proceeding in which the Court is authorized to hear and

determine all matters relating to this case in accordance with 28 U.S.C. § 157(b)(2)(I)"). Thus, the Court rejects this argument.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

The Bankruptcy Court's February 28, 2019, order granting Casey Anthony's Motion for Summary Judgment and its Final Judgment in Anthony's favor are **AFFIRMED**. The Clerk is directed to transmit a copy of this Order to the Bankruptcy Court and thereafter close this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 7th day of January, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE